**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

AENERGY, S.A.,                                             :

              *Plaintiff*,                         :

          v.                                          :

REPUBLIC OF ANGOLA; MINISTRY OF        :    **CIVIL ACTION NO.**   22-cv-2514
ENERGY AND WATER OF THE REPUBLIC OF
ANGOLA; MINISTRY OF FINANCE OF THE          :    **COMPLAINT**
REPUBLIC OF ANGOLA; EMPRESA PÚBLICA
DE PRODUÇÃO DE ELECTRICIDADE, EP; and       :
EMPRESA NACIONAL DE DISTRIBUIÇÃO DE
ELECTRICIDADE,                                             :

              *Defendants.*                         :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Plaintiff Aenergy, S.A. ("AE"), as and for its complaint against defendants the Republic

of Angola (the "Republic"), the Ministry of Energy and Water of the Republic of Angola

("MINEA"), the Ministry of Finance of the Republic of Angola ("MINFIN"), Empresa Pública

de Produção de Electricidade, EP ("PRODEL"), and Empresa Nacional de Distribuição de

Electricidade ("ENDE") (collectively referred to as the "Defendants" or "Angola"), with

knowledge as to itself and as to the facts within their possession, and otherwise on information

and belief, hereby alleges as follows:

**NATURE OF ACTION**

1.     This is a simple breach of contract action for unpaid work and supplies.  It arises

out of the Republic of Angola's repudiation of commercial contracts with Plaintiffs for the

construction, extension, refurbishment, operation, and maintenance of power plants in Angola.

Plaintiff provided substantial performance to its counterpart, the Republic of Angola, including

installing power plants right before the last Presidential election, at the request of the

then-Minister of Energy and Water (who continues to hold that role under the current administration), thus directly benefiting its contractual counterpart.  Angola, however, received far more goods and services from AE than AE was paid for.  By this action, Plaintiff seeks compensatory damages for the work and services Angola obtained by way of these contracts before their repudiation, and which Angola never paid for.

2.      Previously, Plaintiff and one of its affiliates pursued an action for damages against both Angola and U.S.-based General Electric Co. (and its related entities) arising out of the termination of these contacts.  That suit was brought before the U.S. District Court for the Southern District of New York ("SDNY").  *See Aenergy, S.A. et al. v. Republic of Angola et al.*, Case No. 20-cv-3569 (JPC) (S.D.N.Y.).  Angola and the GE defendants moved to dismiss that action based on the doctrine of *forum non conveniens*, and the SDNY granted that motion in May 2021.

3.      The U.S. Court of Appeals for the Second Circuit affirmed that *forum non conveniens* dismissal.  In the Second Circuit's decision, the court of appeals held that Plaintiff's claims against Angola—claims for taking of property in violation of international law, wrongful termination of contract, and unjust enrichment—were more appropriately heard in an Angolan court, because Angola had an interest in its own courts resolving a dispute against it, because Plaintiff had previously sought administrative relief there, and because evidence relevant to those particular claims were more easily accessed in Angola—namely, Angola's officials.

4.      Notably, material events have occurred since SDNY and Second Circuit decisions were announced.  For instance, when making its motion to dismiss, Angola represented to the SDNY that the Republic had taken "temporary possession" of certain property owned by Plaintiff (specifically, turbines and associated equipment) in order "to secure and preserve" it

2

while Plaintiff and Defendants were litigating a related dispute in Angolan court.  Case No. 20-cv-3569 (JPC) (S.D.N.Y.), Dkt. 61 at 12.  However, after the SDNY action was dismissed and despite being completely contrary to its representations to the SDNY, Angola took *permanent* possession of AE's property by connecting AE's turbines to Angola's power grid as publicly announced by the Angolan Ministry of Energy on March 18, 2022.  Then, following the Second Circuit's decision, the President of Angola on June 9, 2022, proclaimed on national television that the SDNY action had been dismissed on the merits, despite this being completely false.

5.      Neither the SDNY nor the Second Circuit ever addressed the question of whether the claims asserted here can be brought in Angola despite the fact that the procedural vehicle for bringing such claims in Angola was only open for a period of 180 business days.  Now that this period has lapsed, there is no other available forum for the breach-of-contract claim asserted here.  As a result, and because Angola's recent actions provide further proof that AE cannot obtain justice in Angola, Plaintiff respectfully brings this breach of contract claim for unpaid work.

## THE PARTIES

6.      Plaintiff AE (formerly known as Aenergia, S.A.) is a Portuguese-shareholder-owned corporation constituted under the laws of the Republic of Angola in 2012.  At all times relevant to this complaint, AE was run by senior executives and directors out of executive headquarters in Lisbon, Portugal (where its books and records were and are maintained), while AE's principal commercial activities were undertaken in Angola (although AE also carried business negotiations and activities elsewhere, including but not limited to the United States).

7.      Defendant the Republic of Angola (the "Republic") is a "foreign state" within the meaning of 28 U.S.C. § 1603(a).  The current President of the Republic is the leader of Angola's

ruling political party, the MPLA ("People's Movement for the Liberation of Angola").  For almost fifty years, without any interruption, the MPLA has ruled Angola, and today it exerts substantial influence over various sectors of Angolan society, including but not limited to the judiciary.  For example, eight of the eleven judges sitting on Angola's Constitutional Court are nominated by the MPLA, either through the Office of the Angolan President or the MPLA-controlled National Assembly.  Furthermore, the leadership of Angola's Supreme Court is appointed by the President of the Republic, and Angolan judges are commonly known to be members of the MPLA (which is led by Angola's President).

8.     Defendant Ministry of Energy and Water of the Republic of Angola ("MINEA"), a ministry of the Republic of Angola, is a political subdivision of the Republic and is thus a "foreign state" under 28 U.S.C. § 1603(a).  Although a foreign state under the Foreign Sovereign Immunities Act ("FSIA"), MINEA is responsible for providing power and water and conducts various commercial activities in relation to that function.

9.     Defendant Ministry of Finance of the Republic of Angola ("MINFIN"), a ministry of the Republic of Angola, is a political subdivision of the Republic and is thus a "foreign state" under 28 U.S.C. § 1603(a).  As noted herein, it entered into a U.S. Dollar-denominated financing agreement ("credit facility") with U.S.-based GE Capital in order to pay for the contracts underlying Plaintiffs' claims in this case, among other things.

10.     Defendant Empresa Pública de Produção de Electricidade, EP ("PRODEL"), a subsidiary entity of MINEA (which is a ministry of the Republic of Angola), is an "agency or instrumentality" of Angola under 28 U.S.C. § 1603(b) because (1) as a public company, it is a separate legal person; (2) it is an organ or political subdivision of the foreign state; and (3) it is not a citizen of any state of the United States as set forth under 28 U.S.C. § 1332(c).

Accordingly, PRODEL is a "foreign state" under 28 U.S.C. § 1603(a), which defines a "foreign state" to include an "agency or instrumentality of a foreign state."

11.     Defendant Empresa Nacional de Distribuição de Electricidade ("ENDE"), a subsidiary entity of MINEA (which is a ministry of the Republic of Angola), is an "agency or instrumentality" of Angola under 28 U.S.C. § 1603(b) because (1) as a public company, it is a separate legal person; (2) it is an organ or political subdivision of the foreign state; and (3) it is not a citizen of any state of the United States as set forth under 28 U.S.C. § 1332(c). Accordingly, ENDE is a "foreign state" under 28 U.S.C. § 1603(a), which defines a "foreign state" to include an "agency or instrumentality of a foreign state."

12.     Non-party General Electric Company ("GE Co.") is a New York corporation with its principal place of business in Boston, Massachusetts.

13.     Non-party GE Capital EFS Financing, Inc. ("GE Capital") is a Delaware corporation with its principal place of business in Norwalk, Connecticut.

## JURISDICTION AND VENUE

14.     This Court has subject-matter jurisdiction over the claims asserted against Defendants under 28 U.S.C. § 1330(a), which provides that "[t]he district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state" within the meaning of 28 U.S.C. § 1603(a).

15.     This Court also has subject-matter jurisdiction over this action under 28 U.S.C. § 1605(a)(2) because the claim asserted is "based upon a commercial activity carried on in the United States by the foreign state" and/or because it is based upon "an act performed in the United States in connection with a commercial activity of [the Defendants] elsewhere" and/or because it is based upon "an act outside the territory of the United States in connection with a

commercial activity of [the Defendants] elsewhere" that "cause[d] a direct effect in the United States," such that the Defendants are not immune from suit for those claims.

16.     This Court has jurisdiction over the Republic of Angola under 28 U.S.C. § 1330(a) and 28 U.S.C. § 1603(b).

17.     This Court has jurisdiction over MINEA under 28 U.S.C. § 1330(a) and 28 U.S.C. § 1603(b).

18.     This Court has jurisdiction over MINFIN under 28 U.S.C. § 1330(a) and 28 U.S.C. § 1603(b).

19.     This Court has jurisdiction over PRODEL under 28 U.S.C. § 1330(a) and 28 U.S.C. § 1603(b).

20.     This Court has jurisdiction over ENDE under 28 U.S.C. § 1330(a) and 28 U.S.C. § 1603(b).

21.     Venue is proper pursuant to 28 U.S.C. § 1391(f)(4) because this suit is brought against a foreign state and its political subdivisions, and Congress intended to make this District a venue for all suits brought against foreign sovereign states not immune from suit.

## FACTUAL BACKGROUND

### I.     AE IS ESTABLISHED AND FLOURISHES

22.     Ricardo Machado is a Portuguese investor and entrepreneur.  He observed that energy and transportation companies operating in certain African countries often were not just unreliable but also supplying their services at very high prices.  Exacerbating the problem, he observed, local companies in Angola typically acted as agents or distributors for international conglomerates, but did not develop long-term, sustainable solutions based on local know-how.

23.    At around this time, Angola publicly announced that it would award power projects by selecting an international manufacturer of relevant equipment (such as General Electric or Siemens) and award projects to a fully functioning entity that would use those products and handle all related installation and construction in partnership with the international manufacturer.

24.    Sensing an opportunity, Mr. Machado believed he could change the way business was done in Angola and, in the process, deliver cost-effective, reliable, and environmentally friendly energy solutions.  The idea was to build a fully functioning enterprise from the ground up, leverage local know-how, invest in training, and partner with an international manufacturer.

25.    Machado and AE first put their vision to the test in 2013, when AE initiated its first significant project in Angola—the construction of Malange Power Plant.  Although this was a relatively small project relative to the Angolan power grid, it permitted AE to prove the viability of its founding principles to the Angolan government and show that AE could deliver cost-efficient and reliable solutions in line with international standards.

26.    After additional successes with projects in Angola, AE and senior executives from GE entered into discussions regarding a "mega power" deal that AE could market to Angola using GE technology and international financing.

27.    To that end, AE engaged with the government of Angola, proposing to have Angola commission AE (in collaboration with GE Co. and the various entities controlled by it) to fulfill significant infrastructure projects in line with the country's development objectives reflected in published guidance.  The projects AE discussed with Angola would call for AE to install new power-plant facilities using more than half a dozen GE-manufactured power turbines (among other equipment); AE would also service existing and new power plants under long-term

contracts, and build out the country's water infrastructure. By mid-2017, AE was in advanced discussions with Angola to work on a number of significant and high-priority projects.

II. **ANGOLA SECURES FINANCING FROM U.S.-BASED GE CAPITAL UNDER A FACILITY THAT ALLOWS GE TO BE PAID BY ANGOLA DIRECTLY IN THE UNITED STATES FOR AE'S OBLIGATIONS TO GE**

28.     One of the main variables that stood in the way of Angola signing contracts with AE commissioning power projects was the Angola's ability to obtain financing for such projects. This hurdle was overcome, however, when GE Capital, General Electric's U.S.-based financial arm, agreed to provide funding to Angola for such projects via a $1 billion credit facility (the "Facility") that would be used to finance Angola's power-grid development goals. In turn, Angola agreed to assume the obligation of relevant state-owned entities to pay GE back for the financing by way of a "sovereign guarantee" of repayment.[1]

29.     AE was not a party under the Facility and was not involved in the negotiations between GE and Angola, but given that the U.S. financing would be obtained by Angola solely to pay for AE's projects, AE was provided information on the contemplated financing structure and also the opportunity to provide suggestions based on AE's experience in the region. As relevant to this dispute, AE's understanding of the Facility's key characteristics is, among others, that:

a.   GE Capital, acting on behalf of GE and backed by the credit of GE, would provide $1.1 billion in financing to Angola's finance ministry (MINFIN) for the sole purpose of permitting Angola to pay AE to complete contracts for the power and water projects then under advanced discussions. The sole purpose of the financing, which MINFIN would draw one, would solely be to permit MINEA to pay AE for the power projects then being negotiated between AE and MINEA.

---

[1] *See generally* Embassy of the Republic of Angola in Japan, *GE Invests USD 1 Billion in Angola*, https://www.angola.or.jp/2017/01/26/ge-invests-usd-1-bilion-in-angola (last visited Aug. 17, 2022).

b.   Although the financing agreement on its face allowed multiple draws, it was initially anticipated that the entire $1.1 billion would be drawn up-front by MINFIN, MINEA was to pay AE upfront all the amounts due under the OSCs, and AE would in turn pay GE upfront what GE was due under contracts between AE and GE by which AE had agreed to purchase certain goods and services.

c.   As a matter of mechanics, it was expected and agreed that GE Capital, as lender, would send a substantial portion of the $1.1. billion in funds from the United States drawn by Angola directly into the accounts of GE entities receiving payment on account of supply contracts between AE and GE, some of which were in the United States.  GE explained that it wished to use a "direct funding" mechanism to effectuate in a single payment transfer what would be in reality three different commercial transactions: (a) Angola drawing funds from GE; (b) Angola paying AE for the goods and services to be performed under contracts between those parties, and (c) AE paying GE pursuant to the supply contracts under which AE would purchase GE-manufactured equipment.

d.   The balance of funds would go directly to AE, and AE could and would use it to pay obligations to its other suppliers and counterparties, as well as employees, and it would derive a profit from the balance.

30.   The foregoing structure is reflected in an internal GE document, which is consistent with the structure designed by GE and Angola, and was shared with AE:



31.     According to GE internal documents, the use of "**USD contracts**" on "[a]ll GE contracts" (including both the supply contracts with AE and the GE Capital Credit Facility) had another benefit—it avoided "FX risks" (*i.e.*, currency risks) to the GE organization and allowed GE to rely on New York's stable and transparent banking system (while mitigating Angola corruption risks).  Ex. 1.[2]  Similarly, other internal GE documents explain that GE's use of the facility "for payment of GE equipment and services contract with AE [in U.S. dollars] shifts the AR [(or account-receivable)] payment risk from AE" by turning it into a sovereign obligation.

32.     Angola's President approved the $1.1 billion GE Capital facility in the summer of 2017.

---

[2] A version of this document was first obtained from non-party General Electric ("GE") via a proceeding initiated pursuant to 28 U.S.C. § 1782 in the U.S. District Court for the Southern District of New York, *In re Aenergy, S.A.*, Case No. 1:19-mc-00542-VEC (S.D.N.Y.).  Although discovery material in that proceeding is subject to a protective order between GE and AE, General Electric in a later proceeding expressly permitted the document attached here as Exhibit 1 to be publicly docketed, thus placing this document outside the scope of that protective order.  *See Aenergy, S.A. v. Republic of Angola*, Case No. 1:20-cv-03569-JPC (S.D.N.Y), Dkt. 8 (letter from GE counsel), Dkt. 10-1 (public docketing of exhibit).

III.   **ANGOLA AND AE AGREE TO 13 "ON-SALE CONTRACTS" THAT WERE FINANCED UNDER GE CAPITAL'S U.S. DOLLAR-DENOMINATED FACILITY**

33.   By the end of July 2017, Angola also signed (through its instrumentalities and/or state-owned companies) a total of 13 contracts with AE for $1.148 billon.  The projects, known as the "On-Sale Contracts" or "OSCs," included the following:

a.   OSC 1 was signed on 23 July 2017 and required AE to install a power plant deploying two new TM2500s at the New Menongue plant.

b.   OSC 2 was signed on 23 July 2017 and involved the improvement of the New Cuito Power Plant using GE gensets.

c.   OSC 3, which was initially signed on 9 December 2014 and originally called for AE to improve the infrastructure at the Cabinda power plant, had been modified to require the installation of a power plant using three new TM2500 turbines at a different site in Angola (Quileva).

d.   OSC 4, signed on 23 July 2017, was a long-term maintenance agreement ("CSA") to maintain the Cabinda power plant.

e.   OSC 5, signed on 23 July 2017, required AE to install GE aeroderivative products.

f.   OSC 6, signed on 23 July 2017, was a five-year, $350-million contract that required AE to service and maintain a power plant known as "Soyo I" using GE technology.

g.   OSC 7 was signed on 23 July 2017, and required AE to supply a power plant using up to two new TM2500s, and to provide a "bank" of spare parts (some

manufactured by GE and some not) from which Angola could draw to support its needs for servicing its turbine fleet on an ongoing basis.

h.  OSC 8 was signed on 23 July 2017, and involved maintenance needs (including supplying parts) at the Boavista I Thermal Power Station.

i.  OSC 9 was signed on 23 July 2017, and required AE to supply spare parts at a power plant in Namibe.

j.  OSC 10, signed on 23 July 2017, required AE to install a power plant in Viana.

k.  OSC 11 was signed on 17 July 2017 with ENDE. It entailed nearly twenty energy projects in rural parts of Angola using industrial generators, home generators and photovoltaic kits.

l.  OSC 12 was signed on 21 July 2017 and involved the construction of water systems and the development of Angola's water infrastructure in rural parts of the country.

m.  OSC 13 was signed on 23 July 2017 and involved the installation of one TM2500 turbine, to use as a back-up.

34.    Collectively, these OSCs expressly called for AE to provide MINEA with power plant projects using eight GE-manufactured TM2500 turbines, in addition to other goods and services.

35.    Even before being paid for any of the work under the OSCs, AE began performing – and on some occasions provided performance even before the OSCs were signed as the OSCs reflected agreements that had been reached before then for AE to provide goods and services to Angola.  This included AE providing power

12

IV.     **GE CAPITAL APPROVES A PARTIAL DISBURSEMENT FROM THE FACILITY**

36.     In mid-2017, after the OSCs were signed, AE issued invoices to Angola for payment of all the work to be provided under the OSCs, and which would occur through the U.S.-based GE Capital Credit Facility.  AE's invoices collectively covered Angola's purchase of eight TM2500s from AE and various services performed by Plaintiffs under the OSCs.

37.     In October 2017, PRODEL and ENDE issued letters of intent to consider purchasing four additional GE-manufactured turbines that AE had already contracted to obtain from GE, subject to Angola concluding additional legal and other analyses.

38.     All seemed to be on track for the $1.1 billion disbursement from the GE Capital Facility to occur by year-end 2017.  This included the new Presidential administration opining that the contracts issued by the prior administration were awarded in accordance with Angolan law and procedure, and the minister of energy and water (the same individual who had served in that capacity in the prior administration) requesting the performance of the work.

39.     However, in early November 2017 Angola revealed that, contrary to expectations, MINEA desired to pay for only a fraction of the OSCs, and so MINFIN would draw only a fraction of the GE Capital facility amount rather than the total of $1.1 billion.

40.     Although AE had submitted to MINEA for approval all of its invoices for work completed under the OSCs, MINEA approved AE invoices worth only approximately $625 million, a number later increased to $644 million.

41.     In light of Angola's decision to draw less than the full amount of the Facility at one time, GE agreed to allow Angola to make a partial draw, which it did.

42.     Following this, on or about December 24, 2017, Angola's MINFIN made a utilization request under the GE Credit Facility.  The request stated that Angola wished to borrow

from the GE Credit Facility to make payments owed under the OSCs.  Angola's request directed

the capital agent under the GE Capital Facility to direct the proceeds of the loan to various

accounts for AE and GE, in amounts that had previously been negotiated between AE and GE

(reflecting amounts that AE agreed to pay GE under agreements between AE and GE to which

Angola was not a party).

43.     Pursuant to these requests and an arrangement negotiated between GE and AE, of

the approximately $644 million that was borrowed by Angola and disbursed by GE Capital,

approximately $376 million in U.S. dollars was disbursed from GE accounts in the United States

to other GE accounts in the United States and elsewhere in satisfaction of certain AE obligations

to GE under the AE-GE supply contracts.  The balance went to AE accounts.

## V.      AE PERFORMS UNDER THE ON-SALE CONTRACTS UNTIL ANGOLA REPUDIATES THEM IN 2019

44.     Although Angola did not pay AE upfront for all the work to be performed under

the OSCs, AE continued to have obligations under the OSCs and continued to perform its

obligations thereunder, while Angola continued to ask for performance.

45.     Then, in early January 2019, following a dispute between AE and General

Electric over the terms of their commercial arrangement, MINEA sent AE a letter stating that it

had learned of "irregularities" in the GE Capital Facility and therefore intended to terminate the

OSCs and transfer those contracts to GE.

46.     The stated "irregularities" were in fact based on the lie of GE executives, who

claimed that, even though AE had invoices Angola only for 8 turbines, Angola had paid AE for

12 turbines by way of the December 2017 disbursement.  This lie was based on the unrelated fact

that, for its own purposes, GE considered that the payment it received from AE paid GE for AE's

acquisition from GE of 12 turbines.  But GE was not a party to the OSCs, AE was not a party to

the financing agreement, and Angola was not a party to the AE-GE contracts, and AE had never invoiced Angola for more than 12 turbines.  As a result, there was no basis for this GE lie.

47.     GE's false allegations ultimately led Angola to terminate all of AE's contracts, and Angola made no further payment under them despite insisting on AE completing further work, and despite AE doing so.  Thus, on August 23, 2019, the President of Angola authorized MINEA to terminate the OSCs and to seize the four turbines that GE had alleged had been paid for by MINEA, and on September 2, 2019, MINEA sent AE a letter formally terminating the OSCs (the "Termination Letter").

## VI.     BACKGROUND ON RELATED ACTIONS AND APPEALS

48.     AE sought to have Angola reconsider its position through administrative proceedings, but to no avail.

49.     AE appealed to MINEA Angola's decision to terminate the OSCs; MINEA denied that administrative appeal on September 30, 2019.  AE then appealed that decision to the President of Angola, who denied it on November 13, 2019 in a one-sentence decision.  After the President denied AE's challenge, AE filed an appeal in the Angolan Supreme Court, and provided that Court with evidence obtained from GE in the United States pursuant to 28 U.S.C. § 1782.  But, to date, and since the filing of the action in January 2020, the Angolan Supreme Court has done nothing—disregarding its own procedural deadlines without explanation—and the Angolan state, the respondent in those administrative proceedings, only responded to AE's filings well after the deadline for doing so under Angolan law.[3]

---

[3] Although the Angolan Supreme Court was required to advise AE of any jurisdictional issues within days of the filing, it ignored that deadline.  Moreover, Angola only had 30 days to respond to the filing under Angolan law, but the Angolan government missed the deadline, and served its response only after it was sued in the United States – in September 2020, six months after the deadline.  Then the Angolan Supreme Court, in turn, took another seven months to serve AE a copy of the Angolan government's response – which under Angolan law AE should have received in February 2020 but AE did not obtain until March 2021, more than a year later.

50.     Given that the Angolan Supreme Court bypassed the procedural deadlines set forth in Angolan law, and with a limitation period approaching, in May 2020, Plaintiffs initiated an action for damages in the SDNY against Angola, its state-owned enterprises, and various GE entities.  *See* ¶¶ 2-5, *supra*.  In the SDNY action, Plaintiffs alleged that Angola had taken their property in violation of international law, and improperly terminated their contracts.  The SDNY dismissed those claims on *forum non conveniens* grounds in May 2021 because New York would be inconvenient for Angola's witnesses and Angola had an interest in having its own court adjudicate the dispute.  *Aenergy, S.A. et al. v. Republic of Angola et al.*, 20-cv-3569 (JPC), 2021 WL 1998725 (S.D.N.Y. May 19, 2021).  That judgment was affirmed by the Second Circuit on appeal.  *See Aenergy, S.A. et al. v. Republic of Angola et al.*, 31 F.4th 119 (2d Cir. 2022).

51.     It must be noted, however, that neither the SDNY in the first instance nor the Second Circuit on appeal ever held that AE could bring Angola is an appropriate forum for Plaintiff to seek money damages arising from Angola's failure to pay Plaintiff for the work performed under the OSCs, and indeed it is not an adequate forum given the limitation period that applied there to the initiation of the relevant administrative proceeding in Angola.

52.     Following the decisions of the US courts, Angola plainly took the position that these were dispositions on the merits of the claims.  First, although Angola had placed the disputed turbines on hold, Angola quickly took steps to install the turbines that had been in dispute and to hook them to the power grid there, as publicly announced by Angolan Ministry of Energy on March 18, 2022.  Ex. 2.  Second, the President of Angola publicly (and wrongly) announced on June 9, 2022 that the U.S. courts had twice adjudicated Plaintiff's claims <u>on the merits</u>, once in the SDNY, and the second time on appeal.  Ex. 3.  This announcement by Angola

is false and demonstrates Defendants unwillingness to pay Plaintiff the money it is owed for goods, services, and work performed under the OSCs.

53.     In June 2022, Mr. Machado filed a notification of dispute under the bilateral investment treaty between Portugal and Angola due to Angola's expropriations.  Angola has not yet responded to that notification.

## VII.   ACTS AND EFFECTS IN THE UNITED STATES GIVING RISE TO AND DIRECTLY RESULTING FROM ANGOLA'S COMMERCIAL BREACHES

54.     As stated herein, the Republic, MINEA, PRODEL, and ENDE engaged in commercial conduct and the claims herein are based on Defendants' commercial activity.

55.     For the reasons set forth herein, Defendants are properly sued in the United States and not subject to immunity because Plaintiffs' claims against them are "based upon a commercial activity carried on in the United States by the foreign state" and/or because they are based upon "act[s] performed in the United States in connection with a commercial activity of [Defendants] elsewhere" and/or because they are based upon "an act outside the territory of the United States in connection with a commercial activity of [Defendants] elsewhere" that "cause[d] a direct effect in the United States."  28 U.S.C. § 1605(a)(2).

56.     To begin, the conduct described herein constitutes "commercial activity" under the FSIA in that the entry into, performance under, and repudiation of the OSCs are all conduct taken as a private market participant rather than a market regulator, as is the obtaining of financing from a private US entity to pay AE for those contracts.

57.     Moreover, as described in this complaint, the necessary U.S. connection is present, including specifically and without limitation:

　　　　a.  Payments were made out of the U.S. Dollar-denominated, U.S.-based GE Capital Credit Facility on which Angola did draw, and further payment would have been

made out of the United States but for the breach of the contract by Angola. Indeed, the contracts herein were signed only once the US-based financing was structured, and it was structured in such a way as to occur in the United States and outside of Angola, to avoid access to the Angolan system.  Ex. 1.

b.  On or about December 28, 2017, as noted above, GE Capital made a disbursement of $644 million out of US accounts to pay AE for work under the OSCs.  This included a payment to GE Power of approximately $376 million in U.S. Dollars from accounts at Deutsche Bank in New York, to accounts in New York for further credit either in the United States or abroad.  These payments were made by GE Capital using funds that Angola drew from the GE Capital Facility to pay for AE's invoices to MINEA (to pay AE for eight turbines and additional goods and services), and the money was directed to GE directly to ensure that GE would be paid from the GE Capital facility on account of amounts due by AE to GE under the AE-GE supply contracts.

c.  AE purchased the turbines at issue in the OSCs from GE in U.S. Dollars.

d.  GE manufactured the engines for all the TM2500 turbines at issue in this case in the United States, and these were initially shipped from the United States.

e.  As the President of Angola recently acknowledged in public, Defendants' decision to terminate its contracts with AE resulted in Angola having a "direct link with the American General Electric" and GE's U.S. business operations. Ex. 3 at 4.

**<u>COUNT ONE</u>**

**BREACH OF CONTRACT—FAILURE TO PAY**

58.     Plaintiffs repeat and reallege paragraphs one through 57 as if fully set forth herein.

59.     The OSCs were binding and enforceable contracts.

60.     AE fully performed its obligations under the OSCs, and satisfied all conditions to Angola's performance.

61.     Angola breached the OSCs by failing to pay substantial amounts for work, goods, and services that Angola actually obtained and claimed to have obtained from AE under the OSCs.

62.     AE suffered damages as a cause of this breach, namely it was not paid for the substantial work, goods, and services that Angola obtained and claimed to have obtained from AE under the OSCs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

1.  Grant judgment against all Defendants, and award Plaintiff such damages,

    including compensatory damages, as may be proved at trial, as well as costs.

2.  Enter an order requiring Defendants to pay pre- and post-judgment interest.

3.  Grant Plaintiffs such other and further relief as the Court deems just and proper.


DATED:   New York, New York              Respectfully submitted,
         August 22, 2022

                                         **HOLWELL SHUSTER & GOLDBERG LLP**


                                         By: _____ */s/ Vincent Levy* _____.

                                         Vincent Levy
                                         425 Lexington Avenue, 14th Floor
                                         New York, NY 10017
                                         (646) 837-5151
                                         vlevy@hsgllp.com

                                         *Counsel for Plaintiffs*