## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **AENERGY, S.A.**, | |
| Plaintiff, | |
| v. | Case No. 1:22-cv-02514 (TNM) |
| **REPUBLIC OF ANGOLA**, *et al.*, | |
| Defendants. | |

## <u>MEMORANDUM OPINION</u>

This is a case about forum-shopping.  Plaintiff Aenergy, S.A. alleges that the Republic of Angola unlawfully terminated several utility contracts awarded to it by the Angolan government. Aenergy sought to have those contracts reinstated in Angolan court, and that case remains pending.  Soon after, Aenergy filed a lawsuit seeking damages for breach of contract in the Southern District of New York.  The court dismissed that suit under the doctrine of *forum non conveniens*.  The Second Circuit affirmed.

 Aenergy takes another swing in this district.  It again sues Angola and various arms of Angola's government for breach of contract.  Defendants again move to dismiss.  The Court will grant that motion.  Aenergy cannot overcome the prior dismissal's preclusive effect.  And regardless, this Court agrees with the well-reasoned decisions of the Southern District and Second Circuit and finds that this case belongs in an Angolan court.

## I.

Aenergy is an Angolan energy company owned by a Portuguese citizen, Ricardo Machado.  Am. Compl. (Compl.) ¶ 28, ECF No. 28.  Between 2014 and 2017, Aenergy inked 13 contracts with Defendants Empresa Pública de Produção de Electricidade, EP ("PRODEL") and

Empresa Nacional de Distribuição de Electricidade ("ENDE").  *See id.* ¶ 36.  These utility companies are subsidiaries of the Angolan Ministry of Energy and Water.  *See id.* ¶¶ 12–13.

The contracts at issue required Aenergy to construct, supply, and maintain power plants and water infrastructure in Angola.  *See id.* ¶ 36.  Together, these utility contracts are worth over a billion dollars.  *See id.*

Aenergy worked with General Electric ("GE") and some of its corporate affiliates to fulfill the contracts.  *See id.* ¶¶ 14-16.  In particular, the contracts required Aenergy to install turbines manufactured by GE Packaged Power, Inc.  *See id.* ¶ 37.  Angola also partnered with GE.  To fund its infrastructure projects, Angola entered a financing agreement with General Electric Capital Energy Financial Services, Inc. ("GE Capital"), the financial arm of GE.  *See id.* ¶ 31.  GE Capital provided one billion dollars in credit to Angola in exchange for a sovereign guarantee of repayment.  *See id.*  Under the terms of the agreement, GE Capital would disburse money from the credit facility at the request of the Angolan Ministry of Finance.  *See id.* ¶ 37.

Ordinarily, Angola would have transferred funds from GE into its own accounts to pay Aenergy.  Then Aenergy would have used a portion of those funds to pay GE Packaged Power for the turbines.  *See id.* ¶ 32(b).  To simplify this arrangement, Angola and GE Capital added a "direct funding" mechanism to their financing agreement.  *See id.* ¶ 32(c).  This mechanism allowed GE Capital to transfer the money owed to Aenergy by Angola directly into Aenergy accounts.  *See id.* ¶ 32(d).  Similarly, GE Capital would directly transfer the funds owed to GE Packaged Power for the turbines into its accounts.  *See id.* ¶ 33.  This funding mechanism created efficiencies by avoiding transferring funds through the Angolan government as an intermediary.  *See id.* ¶ 32(c).

After the Angolan government finalized the financing arrangement, Aenergy began performance and invoiced the Angolan government for its work. *See id.* ¶¶ 38-39.  In December 2017, Angola withdrew $644 million of its GE credit, sending $277 million to Aenergy and $367 million to GE Packaged Power.  *See id.* ¶ 46.

Things went south in early 2019.  A dispute arose between Aenergy and GE over the terms of their turbine supplier agreement.  *See id.* ¶ 48.  GE claimed that even though Aenergy had invoiced Angola only for eight turbines, Angola had paid Aenergy for 12 turbines.  *See id.* ¶ 49.  By Aenergy's account, this was a "lie" based on a GE accounting error.  *Id.*

Soon after, Angola's president directed the Ministry of Energy and Water to terminate the utility contracts over concerns about the "irregularities" in the number of turbines Aenergy had purchased.  *See id.* ¶ 48.  The Angolan government claimed that Aenergy had purchased four turbines without its approval.  *See* Mot. to Dismiss (MTD) at 5, ECF No. 24.  And Angola revealed its intention to transfer the utility contracts directly to GE.  *See* Compl. ¶ 48.  Angola viewed Aenergy as an "intermediary" between Angola and GE—and the Angolan government decided to cut out the middleman.  *See id.* ¶ 67(f).

In August 2019, the president formally authorized the Ministry of Energy and Water to terminate the contracts with Aenergy.  *See id.* ¶ 52.  The president also authorized the minister to seize the four turbines that Aenergy had bought from GE.  *See id.*  The minister then provided Aenergy notice of the contract termination in a letter.  *See id.* ¶ 53.  Following the termination, Angola made no more payments to Aenergy.  *See id.* ¶ 54.

In response, Aenergy launched an international legal campaign.  *See id.* ¶¶ 56-59. Aenergy started in Angola.  First, it appealed Angola's decision to terminate the contracts to the Ministry of Energy and Water.  *See id.* ¶ 57.  The Ministry denied that appeal.  *See id.*  Aenergy

then appealed that decision to the president.  *See id.*  After he denied its appeal, Aenergy appealed to the Supreme Court of Angola.  *See id.*  That appeal remains pending.  *See id.*

A few months after filing that appeal, Aenergy decided to try its luck with U.S. courts. *See id.* ¶ 58.  It sued the Republic of Angola, the Ministry of Energy and Water of Angola, the Ministry of Finance of Angola, PRODEL, and ENDE (together, "the Angolan Defendants") in the Southern District of New York.  *Id.*  It also sued three GE entities for their role in the kerfuffle.  *Id.*  Aenergy explains that it decided to initiate parallel proceedings there because the Angolan Supreme Court had missed procedural deadlines and a limitations period was approaching for some of its claims.  *See id.*

Aenergy brought ten claims against the various Defendants.  *See* Compl., *Aenergy, S.A. v. Republic of Angola (Aenergy I)*, No. 20-cv-3569 (S.D.N.Y. May 7, 2020), ECF No. 1.  Against the Angolan Defendants, Aenergy asserted six claims, including breach of contract, unjust enrichment, taking of physical assets, taking of intangible assets, and conversion.  *Id.* ¶¶ 227–77. Against the GE Defendants, Aenergy alleged tortious interference with contract and tortious interference with prospective business relations.  *Id.* ¶¶ 278–89.  And Aenergy asserted an accounting claim and aiding and abetting claim against them all.  *Id.* ¶¶ 290–98.

All Defendants moved to dismiss, arguing, among other things, that *forum non conveniens* warranted dismissal in favor of an Angolan forum.  *See Aenergy I*, No. 20-cv-3569, 2021 WL 1998725, at *7 (S.D.N.Y. May 19, 2021).  In a 29-page opinion, Judge Cronan agreed with Defendants and dismissed on *forum non conveniens* grounds without reaching Defendants' other arguments.  *See id.* at *20.  Aenergy then appealed to the Second Circuit.

The Second Circuit affirmed in a published opinion.  *See Aenergy. S.A. v. Republic of Angola (Aenergy II)*, 31 F.4th 119, 124 (2d Cir. 2022).  Aenergy then sought panel rehearing and

rehearing en banc. *See* Pet. for Reh'g or Reh'g En Banc, No. 21-cv-1752 (2d Cir. May 11, 2022), ECF No. 125. Those requests were denied. *See* Order, No. 21-cv-1572, ECF No. 130. Undeterred, Aenergy filed a writ of certiorari with the Supreme Court, which was also denied. *See* 143 S.Ct. 576 (2023) (mem.).

Two months after the Second Circuit denied rehearing and rehearing en banc, Aenergy filed a new Complaint here. This time around, Aenergy dropped its claims against the GE Defendants. But it sued the same Angolan Defendants, narrowing its Complaint to one count of breach of contract. *See generally* Compl.

Defendants now move to dismiss. They argue that (1) they are immune from suit under the Foreign Sovereign Immunities Act ("FSIA"); (2) this suit is precluded by the prior New York litigation; (3) the Court should dismiss this case under the doctrine of *forum non conveniens*; (4) this suit is subject to mandatory arbitration; (5) the pending parallel proceedings in Angola justify abstention; and (6) Aenergy fails to state a claim against each Defendant.[1]

The Court agrees that Aenergy is precluded from relitigating the Southern District's and Second Circuit's comprehensive decisions. Even if Aenergy were entitled to another chance, the result would be the same: this suit belongs in Angola and should be dismissed on *forum non conveniens* grounds. The Court will thus grant Defendants' motion to dismiss.

## II.

Courts use the doctrine of *forum non conveniens* "to deal with inappropriate forum-shopping." *Hueter v. Kruse*, 610 F. Supp. 3d 60, 66 (D.D.C. 2022). It is a threshold inquiry that permits dismissal "when considerations of convenience, fairness, and judicial economy so

---

[1] The parties request oral argument on the pending motions. Because the Court finds the parties' submissions sufficient to decide the issues, it declines this request. *See* LCvR 7(f).

warrant." *Sinochem Int'l Co. v. Malaysia Int'l Shipping Co.*, 549 U.S. 422, 432 (2007) (cleaned up). The doctrine is most often invoked when the alternative proposed forum is foreign. *See Hueter*, 610 F. Supp. 3d at 67. And unlike the statutes governing venue within the federal-court system, dismissal rather than transfer is the proper remedy. *See id.*

Defendants submit that the Southern District's *forum non conveniens* dismissal precludes Aenergy from challenging the doctrine's application here. They rely on issue preclusion, also called "collateral estoppel." *See Bushrod v. District of Columbia*, 521 F. Supp. 3d 1, 12 (D.D.C. 2021).

Under that doctrine, "once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *USPS v. Am. Postal Workers Union*, 553 F.3d 686, 696 (D.C. Cir. 2009) (cleaned up). Relevant here, collateral estoppel works to guard against "the expense and vexation attending multiple lawsuits, conserve judicial resources, and foster reliance on judicial action by minimizing the possibility of inconsistent decisions." *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (cleaned up).

Collateral estoppel applies to *forum non conveniens* dismissals. Generally, "[i]f one federal court dismisses an action on the basis of *forum non conveniens*, a second federal court in which the case is brought is bound by that decision." 14D Wright, Miller, Cooper & Freer, *Federal Practice & Procedure* § 3828.5, at 730 (4th ed. 2013); *accord Amore ex rel. Estates of Amore v. Accor, S.A.*, 484 F. Supp. 2d 124, 129 (D.D.C. 2007). The party invoking collateral estoppel bears the burden of showing that the doctrine applies. *See In re Subpoena Duces Tecum Issued to Commodity Futures Trading Comm'n*, 439 F.3d 740, 743 (D.C. Cir. 2006).

Collateral estoppel makes a "prior determination of a legal or factual issue" conclusive in a later case when (1) "the same issue now being raised" was "contested by the parties and submitted for judicial determination in the prior case" and (2) the issue was "actually and necessarily determined" in that prior case. *Id.* (cleaned up). Preclusion must also not be unfair to the party it is asserted against. *See id.*

The Court takes each requirement in turn.

### A.

The Court first considers whether the *forum non conveniens* issue before it is the "same" as in the prior case. *Id.* "Identity of the issue is established by showing that the same general legal rules govern both cases and that the facts of both cases are indistinguishable as measured by those rules." 18 Wright, Miller & Cooper, *Federal Practice & Procedure* § 4425 (2d ed. 2012 update). Aenergy argues that the issue presented here is different both because of recent factual developments and because the Second Circuit employs a different *forum non conveniens* standard. Aenergy is wrong.

### 1.

Consider first Aenergy's argument about changed factual circumstances.

A *forum non conveniens* dismissal is appropriate only when "an adequate alternative forum is available to hear the dispute." *In re Air Crash over the S. Indian Ocean on March 8, 2014*, 946 F.3d 607, 612 (D.C. Cir. 2020) (*Air Crash*). Here, as in its prior suit, Aenergy claims that Angolan courts are inadequate because the Angolan judiciary will not provide due process. *See Aenergy II*, 31 F.4th at 131–32; Opp'n at 26–30. The Second Circuit agreed that a lack of due process may render a forum inadequate, but it rejected Aenergy's argument. It found that

Aenergy had not made the "rare" showing of inadequate procedural safeguards in the proposed foreign forum. *See* 31 F.4th at 131.

Aenergy argues here that recent developments now show that it will be deprived of due process in Angola. To be sure, a plaintiff may avoid the preclusive effect of a *forum non conveniens* determination by showing "a change in the *material* facts underlying the judgment." *Vasquez v. Bridgestone/Firestone, Inc.*, 325 F.3d 665, 679 n.24 (5th Cir. 2003) (emphasis added). The problem for Aenergy is that its new factual allegations are not materially different from those that controlled the outcome in *Aenergy II*.

First, Aenergy says that "Angola effectively admitted that its lawyers lied to the Second Circuit about the Angolan judicial process concerning [its] property." Opp'n at 27. According to Aenergy, Angola had represented that the seized turbines were under "provisional administrative control" when really Angola knew those turbines had been turned over to a state-controlled energy company. *Id.* at 27–28. Second, Aenergy says that since the Second Circuit ruled, Angola has seized two more turbines as part of a criminal investigation that "appears to be a sham." *Id.* at 28.

Angola disputes these allegations. But even accepting Aenergy's characterizations as true, Aenergy still loses. The Second Circuit specifically rejected similar allegations in holding that Aenergy had not shown it would be deprived of due process in Angola. *See* 31 F.4th at 132. It reasoned that Aenergy's "argument that the seized turbines went to state-owned power companies that have since deployed them . . . suggests at most that the Angolan court's trustee has failed to fulfill its obligations." *Id.* (cleaned up). And there, as here, Aenergy "ha[d] proffered no evidence that Angola's courts cannot . . . address this asserted failure." *Id.*

Relatedly, the Second Circuit found Aenergy's claims about the turbines immaterial because those allegations concerned executive, not judicial, misconduct. *See id.* Aenergy "d[id] not dispute that the Angolan judiciary is independent from the executive branch." *Id.* Nor did it allege that an Angolan court "committed any other impropriety" concerning the turbines' seizure. *Id.* Aenergy's new complaints about its turbines similarly fail to undermine the integrity of Angolan courts. If Aenergy is right that Angola's executive has unlawfully seized more of its turbines or otherwise acted improperly, that fact does not materially alter the *forum non conveniens* analysis employed by the Second Circuit or this Court.

For this same reason, Aenergy's new allegations about the Angolan president's public statements are also immaterial. It claims that he held a press conference in which he stated that U.S. courts had twice adjudicated Aenergy's claims on the merits and denounced Aenergy as a "foreigner." Opp'n at 29. But this too fails to move the needle. The president's comments are immaterial to the Second Circuit's *forum non conveniens* determination, which focused on evidence of judicial misconduct. And a misstatement of the basis for dismissal shows little.

Aenergy does levy some new allegations against the Angolan judiciary. It argues that it will not receive due process in Angola because the Angolan Supreme Court is moving too slowly and missed procedural deadlines. Aenergy complains that briefing concluded two years ago, and "there has been no activity whatsoever in a case that was supposed to be resolved, by Angolan procedural rule, in a matter of months." *Id.* at 30.

The Court disagrees that this is material. That the Angolan Supreme Court is allegedly moving too slowly does not show "inadequate procedural safeguards." 31 F.4th at 132 (cleaned up). More, Aenergy itself cites a World Bank study showing that it takes, on average, over 3.5 years to receive a disposition on a commercial dispute after suing. *See* Opp'n at 37. It has not

even been that long since Aenergy filed a statement of case in the Angolan Supreme Court. *See* Opp'n at 30. So Aenergy's impatience with the Angolan judiciary does not show it will be deprived of a fair chance to get relief.

The Second Circuit cautioned that "it is not the business of our courts to assume the responsibility for supervising the integrity of the judicial system of another sovereign nation." 31 F.4th at 132 (cleaned up). Aenergy's new allegations about further executive misconduct and its complaints about the pace of its Angolan case do not materially alter the considerations underlying *Aenergy II*. They amount to little more than the type of petty complaints frustrated litigants could lodge against any court system.

Aenergy alleges another material factual change, this time about the Southern District's decision to give Aenergy's choice of forum less deference. The Southern District found that Aenergy's preference for a U.S. court received less deference because its decision to file there implies forum-shopping. *See* 2021 WL 1998725, at *10. Aenergy argues that this finding was "focused principally" on the short amount of time—a few months—that passed between the filing of the Angolan cases and *Aenergy I*. Opp'n at 32. And because more than three years have passed since the Angolan cases were filed, Aenergy says this Court must revisit the Southern District's conclusion.

Not so. The Southern District did not focus on the time between its filing in Angola and the Southern District. The court was clear. It explained that because Aenergy "first chose a different forum to litigate," Aenergy's "decision to file suit in this District thus smacks of forum shopping." 2021 WL 1998725, at *10. The Second Circuit agreed, explaining that the district court had "ample basis" for that finding "as Aenergy 'first chose a different forum to litigate the

termination of the'" utility contracts and "'thus far . . . has not found success in those Angolan proceedings.'"  31 F.4th at 129 (quoting *id.*).

There is no mention of the short amount of time between suits.  The point is that Aenergy filed anew in a potentially more favorable forum after not getting the results it wanted in Angola. So the Court disagrees that the time that has passed since the filing of *Aenergy I* is material to either the district or circuit courts' *forum non conveniens* analysis.

Aenergy has alleged no new material facts requiring this Court to revisit the prior rejections of its due process and deference arguments.

**2.**

Aenergy also argues that collateral estoppel is inapplicable because the D.C. Circuit employs a different *forum non conveniens* standard than the Second Circuit.  *See* Opp'n at 33. This is incorrect.

True, issue preclusion does not apply if the second action involves application of a different legal standard.  *B&B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 154 (2015). And Aenergy correctly notes that, in this circuit, a foreign sovereign defendant can only invoke defenses that are "equally available to private individuals."  *See Philipp v. Federal Republic of Germany*, 894 F.3d 406, 416 (D.C. Cir. 2018).  Aenergy claims that this is not true in the Second Circuit because there "'greater weight' is given to defendants in 'lawsuits against foreign states.'"  Opp'n at 33 (quoting *Aenergy II*, 31 F.4th at 127).

But Aenergy mischaracterizes the Second Circuit's holding.  The court merely explained that "the principles underlying the *forum non conveniens* doctrine apply with *equal weight*— indeed, in *some* cases *perhaps* with greater weight—to lawsuits against foreign states."  31 F.4th at 127 (emphasis added).  The court thus rejected Aenergy's claim that the doctrine is

inapplicable in FSIA cases, *id.* at 126, and it did not articulate a heightened standard for foreign sovereigns.  Indeed, the Second Circuit stated that the policy considerations animating the *forum non conveniens* doctrine are "*not* applicable to every lawsuit involving a foreign sovereign."  *Id.* (emphasis added).  So Aenergy is wrong that a different legal standard applies here.

Aenergy has not shown a significant intervening factual change nor that the Second Circuit applied a different legal standard than what governs in this district.  So Aenergy raises the same issue here as in the prior action.  *In re Subpoena Duces Tecum*, 439 F.3d at 743.

**3.**

Aenergy has another argument about the Second Circuit's holding.  Recall that collateral estoppel requires the "same issue" to have been "contested by the parties and submitted for judicial determination."  *Id.*

The Second Circuit found that Angola provided an adequate forum because it "permits litigation of the subject matter of the dispute."  31 F.4th at 130 (cleaned up).  The court explained that "even if [Aenergy] cannot recover damages on its breach of contract claim against Angola, it has sought equitable contract remedies in Angola."  *Id.* at 131.  This "allow[s] the Angolan court to address the essential subject matter of the dispute."  *Id.*

Aenergy now claims that the Second Circuit concluded sua sponte that Aenergy's petition for equitable relief before the Angolan Supreme Court sufficed to show that Angola provided an adequate forum.  Opp'n at 25.  So, Aenergy says, this issue was not actually "contested by the parties" nor "submitted for judicial determination."  *Id.* (quoting *Jack Faucett Assocs., Inc. v. AT&T Co.*, 744 F.2d 118, 125, 128 (D.C. Cir. 1984)).  Not so.

In its opening appellate brief, Aenergy argued that Angolan courts are inadequate because "[l]oss of the contract-breach claims against Angola would deprive [it] of a key legal

12

theory for hundreds of millions in damages." *See* Appellant Br. at 39, No. 21-cv-1510 (2d Cir. Sept. 9, 2021), ECF No. 87.  And the Angolan Defendants in their briefing countered that Aenergy "filed and [is] prosecuting lawsuits in Angola over the same contracts and property at issue." Appellee Br. at 36, No. 21-cv-1510 (2d Cir. Oct. 13, 2021), ECF No. 103.  The Second Circuit agreed with Defendants, finding that Aenergy's pursuit of equitable remedies for breach of contract showed that Angola provides an adequate forum.  So this issue was "contested by the parties and submitted for judicial determination in the prior case." *In re Subpoena Duces Tecum*, 439 F.3d at 743 (cleaned up).

The first requirement for issue preclusion is satisfied.

## B.

Second, the Court considers whether the *forum non conveniens* issue was "actually and necessarily determined" in *Anergy II*. *Id.*  It was.  Aenergy litigated the issue before both the district court and the Second Circuit on appeal.  And the *forum non conveniens* issue was necessary to both courts' judgments.  Indeed, they relied exclusively on *forum non conveniens* to dismiss the claims in *Aenergy I*. *See* 2021 WL 1998725, at *20; 31 F.4th at 135.

Aenergy responds that the Southern District and Second Circuit never determined that it could bring the claim asserted here in Angolan court.  Recall that Aenergy brought ten claims in *Aenergy I*—two of which were for breach of contract.[2]  Judge Cronan reasoned that because Aenergy's eight other claims could be brought in Angola, that forum permits litigation of the

---

[2] Along with breach of contract, Aenergy alleged against the Angolan Defendants unjust enrichment, taking of physical property in violation of international law, taking of intangible assets in violation of international law, conversion, accounting, and aiding and abetting. *See Aenergy I*, Compl. at 71–79, 83, No. 20-cv-3569 (S.D.N.Y. May 7, 2020), ECF No. 1.

subject matter of the dispute and thus is adequate.  *See* 2021 WL 1998725, at *12–*13.  Aenergy says this case is different because its only claim is for breach of contract.

The Court disagrees.  Aenergy does not assert that it lost its chance to bring those other eight claims in Angola.  It simply declined to plead them here, apparently to avoid the holdings of two other courts that found this case belongs in Angola.  That Aenergy chose to limit its Complaint to a claim that it argues is time-barred does not mean that the subject matter of the dispute cannot be litigated in Angola.

And even if Aenergy is right that its artful pleading undermines the preclusive effect of the district court's adequacy determination, Aenergy cannot avoid the holding of *Aenergy II*.  There, the Second Circuit relied on Aenergy's pursuit of equitable remedies in finding that Angolan courts could address the essential subject matter of the dispute.  The Second Circuit did not consider Aenergy's ability to bring other claims in Angola.  *See* 31 F.4th at 131–32.  It was sufficient that Aenergy was before the Angolan Supreme Court seeking reinstatement of the utility contracts.  *See id.*  So *Aenergy II* necessarily determined that Aenergy's pending suit in Angola provided an adequate forum for its breach of contract claims.

Finally, collateral estoppel applies only when its application does not work a basic unfairness to the party contesting the preclusive effect of the prior judgment.  *In re Subpoena Duces Tecum*, 439 F.3d at 743.

The Court sees no "basic unfairness" here.  Aenergy already had multiple chances to argue this case does not belong in Angola.  And its "incentives to litigate the point now disputed were no less present in the prior case, nor are the stakes of the present case of vastly greater magnitude."  *Martin v. DOJ*, 488 F.3d 446, 455 (D.C. Cir. 2007) (cleaned up).  There is no

indication on this record that the "prior proceedings were seriously defective." *Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 333 (1971).

Aenergy has repeatedly argued that its claims should remain in a U.S. court.  The Court finds no circumstances sufficient to allow Aenergy to avoid the preclusive effect of the prior decisions.  Aenergy has pointed to no factual developments material to the application of the *forum non conveniens* criteria.  Nor has it shown that those criteria differ in this circuit.  Aenergy is thus collaterally estopped from relitigating the prior *forum non conveniens* dismissal here.

### III.

Even if issue preclusion did not require dismissal, this Court would still dismiss Aenergy's complaint on *forum non conveniens* grounds.

A party seeking a *forum non conveniens* dismissal must show both "(1) that an adequate alternative forum is available to hear the dispute, and (2) if so, that the balance of certain public and private interest factors strongly counsels in favor of trying the dispute in the alternative forum." *Air Crash*, 946 F.3d at 612.  Courts weigh the public and private interest factors against "the degree of deference the plaintiff's choice of forum deserves." *Shi v. New Mighty U.S. Tr.*, 918 F.3d 944, 948 (D.C. Cir. 2019).  This "determination is committed to the sound discretion of the trial court." *Id.* (cleaned up).

In this posture, the Court accepts as true Aenergy's factual allegations and draws all reasonable inferences in its favor. *See id.*

### A.

The Court first considers whether Angola is an adequate alternative forum.

15

"Generally, an alternative forum is adequate if the defendants are subject to service of process there and the forum permits litigation of the subject matter of the dispute." *Heuter*, 610 F. Supp. 3d at 67.

Aenergy does not dispute that Defendants are subject to service of process in Angola. Rather, it contends that its breach of contract claim cannot be brought in Angolan courts, challenging the second part of the standard. Opp'n at 24–25; Compl. ¶ 7. Aenergy submits that this claim is barred by a nonwaivable limitations period. The Court credits this allegation. Even so, it does not follow that Angola is an inadequate forum.

When the forum "would provide a plaintiff at least some remedy," the second requirement is satisfied. *Air Crash*, 946 F.3d at 613. "Undeniably, the defendant faces a rather low bar for establishing that the alternative forum is adequate." 14D Wright, Miller, Cooper & Freer, *Federal Practice & Procedure* § 3828.3, at 648–49 (4th ed. 2013). Defendants argue that Angolan courts are adequate for the same reasons given in *Aenergy I* and *Aenergy II*.[3] *See* MTD at 35.

The Court joins those well-reasoned decisions. Angolan courts provide Aenergy with a remedy for its contract dispute. Aenergy filed administrative appeals challenging Angola's termination of the utility contracts. Compl. ¶¶ 56–57. And after Aenergy lost its final administrative appeal, it appealed that decision to the Angolan Supreme Court, seeking reinstatement of the contracts. *See id.*

---

[3] The Court rejects Defendants' argument that it need not show Angola is an adequate forum because the utility contracts contain mandatory forum selection clauses. *See* MTD at 23–27. The contracts contain arbitration clauses, but those clauses do not dictate where arbitration must proceed and thus are not forum selection clauses. *See* Declaration of Henrique Abecasis (Abecasis Decl.) Ex. 14, ECF No. 25-14 (translation of arbitration clauses).

Aenergy responds that this is not good enough because it is barred from seeking damages.  This argument fails.  The alternative forum need not "have identical causes of action or identical remedies to be deemed adequate."  *Lans v. Adduci Mastriani & Schaumberg L.L.P.*, 786 F. Supp. 2d 240, 292 (D.D.C. 2011).  As the Second Circuit reasoned, Aenergy's chance at equitable relief before the Angolan Supreme Court provides "at least some remedy" for its contract dispute.  *Air Crash*, 946 F.3d at 613.

Next, Aenergy reprises its argument that Angolan courts are inadequate because it will be denied due process.  *See* Opp'n at 26–30.  This claim is unpersuasive.  To be sure, "an alternative forum is inadequate if the plaintiff will be treated unfairly there."  *MBI Grp., Inc. v. Credit Foncier Du Cameroun*, 616 F.3d 568, 574 (D.C. Cir. 2010) (cleaned up).  But Aenergy has not made that showing.

Aenergy focuses most of its due process argument on the "recent developments" that it claims undermine the Second Circuit's rejection of this same argument.  This Court has already explained why these new factual allegations are not enough to revive Aenergy's due process argument.  These allegations fail to show that Aenergy will be treated unfairly by Angolan courts for the same reasons.

Aenergy's other arguments are also unpersuasive.  It merely levels generalized criticisms of the independence of Angola's judicial branch.  *See* Opp'n at 26–27.  For instance, they quote "journalist and activist Rafael Marques," who has argued that there is "no separation of powers" in Angola and its judiciary has become "an epicenter of corruption."  *Id.*  Similarly, it points to a report by nonprofit Freedom House which concludes that "[c]orruption and political pressure from the ruling MPLA party contribute to the judiciary's general inefficiency and undermine its independence."  *Id.* at 27 (citation omitted).  These submissions fail.

"General allegations of deficiency" are insufficient to "warrant the conclusion that a foreign forum is inadequate." *MBI Grp.*, 616 F.3d at 575 (cleaned up).  Indeed, the D.C. Circuit concluded that "reliance on a *State Department* report expressing concern about the impartiality of the [foreign] court system . . . is unavailing" to show inadequacy. *El-Fadl v. Cent. Bank of Jordan*, 75 F.3d 668, 678 (D.C. Cir. 1996) (emphasis added) (cleaned up), *abrogated on other grounds by Samantar v. Yousuf*, 560 U.S. 305 (2010).  The opinions of a nonprofit organization and "journalist and activist" are even less persuasive.

Angola is an adequate alternative forum.

### B.

Next, the Court determines the amount of deference due to Aenergy's choice of forum. The Court then balances the private and public interest factors. *See Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 257 (1981).

### 1.

The Court's review of a *forum non conveniens* motion starts with "a strong presumption in favor of the plaintiff's choice of forum." *Id.* at 255.  The degree of deference changes depending on the plaintiff's connection (or lack thereof) to that forum.  As Aenergy concedes, courts give less deference "when the forum is not the plaintiff's home forum and most of the events occurred elsewhere." *Hueter*, 610 F. Supp. 3d at 68; *see* Opp'n at 30.

Aenergy is owed little deference here.  To begin, this district is not its home forum. Aenergy is a corporation constituted under the laws of Angola. *See* Compl. ¶ 8.  Its "principal commercial activities" took place in Angola. *See id.*  And its former executives and directors all reside in Portugal. *See id.*  So Aenergy, a "foreign plaintiff with minimal or no connections to the United States," is entitled to scant deference. *Air Crash*, 946 F.3d at 614.

18

Aenergy responds that because its home is now Portugal, the deference owed to its preference for a U.S. court "is a question of relative convenience as between Portugal and the United States." Opp'n at 32. Not so. "The doctrine of *forum non conveniens* is premised on the assumption that there are at least two forums in which the defendant is amenable to process, and furnishes criteria for choice between them." *Shi*, 918 F.3d at 950 (cleaned up). It is also curious that Aenergy offers Portugal as the relevant comparator when it has not sued there.

More, the sole case Aenergy relies on in support of this novel theory, *Simon v. Republic of Hungary*, explains that "[t]he presence of foreign plaintiffs certainly does not justify the preference for a forum . . . in which *no* plaintiff resides." 911 F.3d 1172, 1183 (D.C. Cir. 2018). So too here. Aenergy prefers a forum where no plaintiff *or* defendant resides. The case for deference here is thus even weaker than in Aenergy's prior litigation, when three Defendants were at home in the United States. *See* 2021 WL 1998725, at *9.

Nor does it appear that Aenergy's choice of forum was motivated by legitimate reasons. *Shi*, 918 F.3d at 950. The Court agrees with Judge Cronan that Aenergy's decision to sue in the United States—after initiating parallel proceedings in Angola's Supreme Court—"smacks of forum shopping." 2021 WL 1998725, at *10. Aenergy repeatedly laments its need to sue in the United States so that it can bring a damages action for breach of contract despite it simultaneously seeking reinstatement of those same contracts in Angola. And "dismissal may be warranted where a plaintiff chooses a particular forum, not because it is convenient, but solely in order to . . . take advantage of favorable law." *Piper Aircraft*, 454 U.S. at 249 n.14.

Aenergy's preference for a U.S. court is owed little deference.

**2.**

Now consider the private interest factors.  To determine which forum the private interest supports, the Court evaluates "(1) the relative ease of access to sources of proof; (2) the availability of process for compelling unwilling witnesses; (3) the cost to obtain attendance of willing witnesses; (4) the need to inspect the premises, if appropriate; and (5) all other practical problems that make trial easy, expeditious, and inexpensive."  *Hueter*, 610 F. Supp. 3d at 69 (citing *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947)).

The first factor supports dismissal.  The events took place almost exclusively in Angola among Angolan parties.  The contracts at issue provided that Aenergy would construct and maintain power plants in Angola to benefit the Angolan people.  The alleged breaches of these contracts occurred in Angola by the Angolan government.  Much, if not all, of the evidence and many witnesses are in Angola or, perhaps, Europe.  Because the core facts occurred primarily in Angola, the "relative ease of access to sources of proof" supports dismissal.  *Id.*

 The second factor supports dismissal as well.  Most of the potential witnesses and evidence is located abroad and "likely . . . beyond the reach of this Court's compulsory process." *BPA Intern., Inc. v. Kingdom of Sweden*, 281 F. Supp. 2d 73, 86 (D.D.C. 2003).  And, as Defendants note, many of the Angolan state officials who will likely testify in defense of Aenergy's claim would be unwilling to travel here given their official roles.  *See* Reply at 18, ECF No. 42.

The third factor favors dismissal too.  Plaintiff says it "will agree to pay reasonable airfare and hotel costs for any witnesses it calls here from Angola."  Opp'n at 36.  Even so, those witnesses would still "have to make a lengthy trip" from Angola to give testimony, "whereas no similar burden is involved in conducting the litigation in" Angola.  *MBI Group, Inc. v. Credit*

*Foncier du Cameroun*, 558 F. Supp. 2d 21, 34 (D.D.C. 2008), *aff'd*, 616 F.3d 568 (D.C. Cir. 2010).  And the witnesses "will all almost surely require translators in order to present live testimony before this Court."  *Id.* at 33.  On the other hand, Portuguese is the official language of Angola, so a language barrier would not exist in Angola for any witnesses residing in Portugal.

The fourth private interest factor is neutral or slightly favors dismissal.  If it is necessary to view the areas of land that were set aside for the proposed power plants or the plants themselves, that could only take place in Angola.

Finally, the "practical problems" with having trial in the District are largely captured by the Court's discussion above.  *Gulf Oil*, 330 U.S. at 508.  And Aenergy's "lawsuits in [Angola] acknowledge that forum as a convenient one."  *Hueter*, 610 F. Supp. 3d at 70.  At bottom, it seems Aenergy continues to sue in the United States to "take advantage of favorable law."  *Piper Aircraft*, 454 U.S. at 249 n.15.

The Court recognizes that Aenergy's founder, Ricardo Machado, and various other former employees have expressed safety concerns with traveling to Angola.  *See* Decl. of Ricardo Machado ¶¶ 3–4, 10, 13–15, ECF No. 36; Decl. of Pedro Bento, ECF No. 32; Decl. of Jose Leitao Amaro, ECF No. 33; Decl. of Jorge Morgado, ECF No. 34.  The Court assumes these "fears are legitimate, and thus [they] weigh slightly against dismissing this action."  *Aenergy I*, 2021 WL 1998725, at *19.  "But because all other private interest factors weigh in favor of dismissal," the Court finds that such fears fail meaningfully to tip the balance in favor of a U.S. court.  *Id.*

So the private interest factors favor litigation in Angola.

**3.**

Now for the public interest factors.  The Court considers "(1) the administrative difficulties caused when litigation piles up in congested centers; (2) the burden of jury duty on a community that has no relation to the litigation; (3) the local interest in having localized controversies decided at home; and (4) the chance that the Court will confront choice-of-law problems or need to interpret foreign law."  *Hueter*, 610 F. Supp. 3d at 70 (citing *Shi*, 918 F.3d at 952).

 First, "the administrative difficulties of trying this case in a forum thousands of miles away from the majority of witnesses and the evidence are obvious."  *MBI Grp.*, 558 F. Supp. 2d at 34 (cleaned up).  The Court will be burdened by the "need for extensive translation of documents and testimony," which is compounded by its inability "to compel the participation of unwilling" foreign government officials.  *Id.*  And this district had 6,001 cases pending as of March 2023—a 2.7% increase over 2022.[4]  Taking on this complicated case will burden a district with an increasingly heavy caseload and not guarantee Aenergy any speedier resolution than in Angolan courts.  Though Aenergy again complains that Angolan courts are slow, there is no evidence that Angolan courts are more or less congested than this district.  *See* Opp'n at 37.

The second factor is inapplicable since no jury trial is available under FSIA.  *See* 28 U.S.C. § 1330(a).

Third, the local interest in having localized disputes decided at home strongly suggests that an Angolan court should hear this case.  Aenergy concedes that the utility contracts "are indeed at the heart of" this dispute.  Opp'n at 37.  And these contracts are between an Angolan

---

[4] Admin. Office of the U.S. Courts, U.S. District Courts – Combined Civil and Criminal Federal Court Management Statistics (Mar. 31, 2023), https://perma.cc/SG34-M29R.

company and the government of Angola to build power plants in Angola to provide energy to the Angolan people.  Neither the parties, witnesses, evidence, nor contracts have any real connection to the United States.  Any "ripple effect" on the credit facility underwritten by GE Capital caused by the termination of these contracts, *id.*, is outweighed by the interest of Angola is resolving this dispute.

The fourth factor favors dismissal because the utility contracts are governed by Angolan law.  *See* Abecasis Decl. Ex. 14.  So there is a high chance that in addressing the merits, the Court would need to solve difficult problems in conflict of laws and the application of foreign law.  For example, both parties have offered expert declarations on the question of whether Aenergy's claim for damages is time-barred in Angola under Angolan law.  Those experts come to opposite conclusions.  *Compare* Decl. of Lino Diamvutu ¶ 21, ECF No. 43 *with* Decl. of Sergio Raimundo ¶¶ 30–31, ECF No. 30.  Though the Court need not decide that question to resolve the case,[5] this scrap over foreign law highlights the types of questions this Court would face if this action remained here.  And the doctrine of *forum non conveniens* is partly designed to help courts avoid "be[ing] required to untangle problems . . . in law foreign to itself."  *Piper Aircraft*, 454 U.S. at 251 (cleaned up).

Thus, the applicable public interest factors all strongly favor an Angolan forum.  And given the wee deference owed to Aenergy's choice to sue here, the Court finds that a *forum non conveniens* dismissal is appropriate.

---

[5]  Aenergy moves to strike this declaration and three others, as well as portions of Defendants' reply.  *See* Mot. to Strike, ECF No. 46.  Aenergy argues that these materials and portions of the brief citing those materials improperly raise new arguments on reply.  Because the Court does not rely on matters or evidence raised for the first time on reply, the Court will deny this motion as moot.

**IV.**

Defendants offer various other reasons why the Court should dismiss this case.  The Court briefly explains why those defenses fail.[6]

**1.**

First, Defendants argue that this Court lacks jurisdiction under the FSIA to consider Aenergy's claims.

The FSIA provides "the sole basis for obtaining jurisdiction over a foreign state in [U.S.] courts." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989). Foreign states are presumptively immune from jurisdiction under the FSIA, subject to nine enumerated exceptions.  *See* 28 U.S.C. §§ 1604, 1605–07.  Unless an exception applies, "the foreign state has immunity and the court lacks subject matter jurisdiction." *Wye Oak Tech., Inc. v. Republic of Iraq*, 24 F.4th 686, 690 (D.C. Cir. 2022).

When, as here, the defendant challenges "only the legal sufficiency of plaintiff's jurisdictional claims [under FSIA], the standard is similar to that of Rule 12(b)(6)." S*chubarth v. Federal Republic of Germany*, 891 F.3d 392, 398 (D.C. Cir. 2018) (cleaned up); *see* MTD at 14. This means that "dismissal is warranted if no plausible inferences can be drawn from the facts alleged that, if proven, would provide grounds for relief." *Schubarth*, 891 F.3d at 398 (cleaned up).  The defendant bears the burden of showing that plaintiff's allegations do not fit within an exception to the FSIA's grant of immunity.  *See id.*

Aenergy invokes clause three of the FSIA's commercial activity exception.  *See* Opp'n at 12.  Under that clause, Defendants are not immune so long as Aenergy's suit is "based upon . . .

---

[6] The Court need not decide whether this suit is subject to mandatory arbitration or whether to stay the case pending resolution of the parallel proceeding before the Angolan Supreme Court.

an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2).

For starters, it is undisputed that Aenergy's breach of contract claim is "based upon . . . an act outside the territory of the United States." *Id.* Defendants acknowledge that the "gravamen" of Aenergy's claim is "Angola's repudiation of the [utility contracts] (an act which occurred in Angola) and non-payment to Plaintiff." MTD at 6–7.

Second, Defendants do not contest that Angola's repudiation and failure to pay were "in connection with" Angola's commercial activity. 28 U.S.C. § 1605(a)(2). "A foreign state engages in commercial activity when it exercises only those powers that can also be exercised by private citizens, as distinct from those powers peculiar to sovereigns." *Ivanenko v. Yanukovich*, 995 F.3d 232, 238 (D.C. Cir. 2021) (cleaned up). Breaching or repudiating a contract, like a "failure to pay . . . invoices," is quintessential private commercial activity. *Wye Oak*, 24 F.4th at 703; *see also Smith v. Overseas Korean Cultural Heritage Found.*, 279 F. Supp. 3d 293, 297 (D.D.C. 2018) ("if the activity can similarly be accomplished by a private party, the action is 'commercial' within the meaning of FSIA.").

The real action is whether Defendants' repudiation and failure to pay "caused a direct effect in the United States." 28 U.S.C. § 1605(a)(2). It has.

The FSIA contains no "requirement of substantiality or foreseeability"—"an effect is 'direct' if it follows as an immediate consequence of the defendant's activity." *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 618 (1992) (cleaned up). Nor does the FSIA demand that the direct effect in the United States harm the plaintiff. *Cruise Connections Charter Mgmt. 1, LP v. Att'y Gen. of Canada*, 600 F.3d 661, 666 (D.C. Cir. 2010).

The utility contracts required Aenergy to purchase turbines from GE Packaged Power, a Delaware corporation with its principal place of business in Texas.  *See* Compl. ¶ 36.  These turbines are manufactured in and shipped from the United States.  *See id.* ¶ 67.  Angola's termination and failure to pay Aenergy led GE to terminate its subcontracts with Aenergy.  *See id.* ¶ 55.  But for the termination, GE would have provided additional goods and services under those contracts to Aenergy.  *See id.*  So Angola stopped money from moving out of the credit facility and into the U.S. accounts of GE Packaged Power, as suppliers.  This "resulted in the direct loss of millions of dollars worth of business in the United States."  *Cruise Connections*, 600 F.3d at 666.

This case is much like *Cruise Connections*.  There, the court found a "direct effect" based on Canada's alleged breach of a contract that required the plaintiff "to subcontract with two U.S.-based cruise lines" to provide ships during the Vancouver Olympics.  *Id.* at 662.  Because "the contract itself required the ships to come from" U.S.-based companies, Canada's breach "led inexorably to the loss of revenues" in the United States.  *Id.* at 665.  So too here.  Defendants' repudiation of the utility contracts caused the GE entities with which Aenergy had subcontracted to lose revenue.  "This is sufficient."  *Id.*

Defendants fail to meaningfully distinguish *Cruise Connections*.  They respond that case has since been "clarified," such that the contract at issue must "provide for or contemplate U.S. performance" for an effect to be direct.  Reply at 5 (citing *Odhiambo v. Republic of Kenya*, 764 F.3d 31, 40 (D.C. Cir. 2014); *Valambhia v. United Republic of Tanzania*, 964 F.3d 1135, 1141 (D.C. Cir. 2020)).  The Court disagrees that either *Odhiambo* or *Valambhia* abrogated the holding of *Cruise Connections*.  Those cases are consistent because the utility contracts did

contemplate U.S. performance—the contracts required that Aenergy acquire supplies from U.S.-based companies.

So Aenergy's claim falls within the FSIA's commercial activity exception, giving this Court jurisdiction.

**2.**

Three Defendants argue that Aenergy has failed to state a claim against them. Because only PRODEL and ENDE formally executed the contracts, the other Defendants (the Republic of Angola, the Ministry of Energy and Water, and the Ministry of Finance) claim that they cannot be liable for any alleged breach. The Court disagrees.

To be sure, foreign states and their agencies and instrumentalities are entitled to a "presumption of independent status." *First Nat. City Bank v. Banco Para El Comercio Exterior de Cuba (Banec)*, 462 U.S. 611, 627 (1983). And generally, a foreign sovereign cannot be sued based on the acts of such an instrumentality. *See Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843, 848 (D.C. Cir. 2000). But that presumption can be overcome when the sovereign's control over its instrumentality renders the sovereign "amenable to suit under ordinary agency principles." *Id.* at 849.

In this context, a principal-agent relationship exists when "[1] the parent has manifested its desire for the subsidiary to act upon the parent's behalf, [2] the subsidiary has consented so to act, [3] the parent has the right to exercise control over the subsidiary with respect to matters entrusted to the subsidiary, and [4] the parent exercises its control in a manner more direct than by a voting majority of the stock in the subsidiary or making appointments to the subsidiary's Board of Directors." *Id.* at 849. No "mechanical" formula determines whether such a relationship exists—the question "is inherently fact specific." *Id.*

At this preliminary stage, and taking Plaintiff's well-pleaded claims as true, Aenergy has plausibly alleged that PRODEL and ENDE acted as Angola's agents regarding the utility contracts. The Angolan government regularly issues policies and directives to these instrumentalities, which "cause [them] to act on behalf of" the state. *See* Compl. ¶¶ 12–13. This dispute came about after a series of such directives. Angola's representations to its Supreme Court leave no doubt that PRODEL and ENDE acted as its agents.

First, the former Angolan president "executed a delegation of powers to . . . the Presidents of the Boards of Directors of . . . PRODEL and ENDE, to represent the Angolan State in the [utility] contracts." Translation of Defense to Sup. Ct. ¶ 78, ECF No. 31-24. This was necessary because the public companies "lack[ed] competence to contract" absent a presidential decree authorizing the contracts' execution. *Id.* ¶ 90. So the contracts "were executed by . . . PRODEL and ENDE, *on behalf of* [the Ministry of Energy and Water]." *Id.* ¶ 85 (emphasis added).

Thus, the Ministry of Energy and Water "was the real counterparty in the Contracts"— "despite it having opted out of mentioning this capacity in the contracts." *Id.* ¶ 90. And the Ministry "acted . . . on behalf of the State, the true contracting party in the Contracts." *Id.* ¶ 92. Indeed, payment under the contracts could be made only after the Minister of Energy and Water approved Aenergy's invoices, and only after the Minister of Finance approved payment. *See* Compl. ¶ 13. More, when things soured between the Angolan government and Aenergy, the president authorized the Ministry of Energy and Water to terminate the utility contracts directly and unilaterally. *See* Compl. ¶ 52; Termination Letter, ECF No. 25-16. So at least with respect to the utility contracts, the Republic of Angola "had plenary control" over PRODEL and ENDE. *TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296, 301 (D.C. Cir. 2005).

PRODEL and ENDE thus acted as Angola's agents.  Angola's statements to its high court demonstrate that it "actually exercised the requisite degree and manner of control" over PRODEL and ENDE as required by *Transamerica*.  *DRC, Inc. v. Republic of Honduras*, 71 F. Supp. 3d 201, 216 (D.D.C. 2014).  The Angolan government directed those entities to contract with Aenergy on its behalf, approved and doled out payments under the contacts, and eventually terminated those contracts itself.  At every step, Angola decided what would happen and ordered PRODEL and ENDE to carry out what the government wanted.

Thus, Aenergy has stated a claim against all Defendants.[7]  For this reason, PRODEL and ENDE's personal jurisdiction arguments fail.  *See* Opp'n at 38.  "Whenever a foreign sovereign controls an instrumentality to such a degree that a principal-agent relationship arises between them, the instrumentality receives the same due process protection as the sovereign: none." *GSS Grp. Ltd v. Nat. Port Auth.*, 680 F.3d 805, 815 (D.C. Cir. 2012).

## V.

Aenergy has had several chances to seek relief for Angola's alleged breach of contract.  It continues to do so in Angola, where its similar case is pending.  And multiple U.S. courts have rejected Aenergy's attempts to bring a parallel proceeding in this country.  Aenergy cannot avoid those well-reasoned decisions by repleading the heart of its case here.  Aenergy has hopped from forum to forum in search of success.  And it has chosen to do its forum-shopping in jurisdictions that have, at best, a tenuous connection to the parties involved and claims asserted.

---

[7]  The Court also rejects Defendants' contention that this case should be dismissed for insufficient service of process.  *See* MTD at 12–13.  Though Aenergy concedes that it addressed the summons and complaint to Angola's "Ministry of Foreign Affairs" rather than "Head of the Ministry of Foreign Affairs," *see* Opp'n at 9, "dismissal is not appropriate when there exists a reasonable prospect that service can be obtained."  *Barot v. Embassy of the Republic of Zambia*, 785 F.3d 26, 29 (D.C. Cir. 2015).

The Court will thus largely grant Defendants' motion to dismiss.  But the Court will deny Defendants' motion insofar as they request dismissal with prejudice.  Dismissals with prejudice are disfavored in this circuit, and the trial court must find that the allegation of other facts consistent with the challenged pleadings could not possibly cure the deficiency.  *See In re Danaher Corp. S'holder Derivative Litig.,* 549 F. Supp. 3d 59, 75 n.12 (D.D.C. 2021).  That high standard is not met here.

A separate Order will issue today.


Dated:  June 20, 2023                                        _____
                                                                          TREVOR N. McFADDEN, U.S.D.J.